Justice Breyer
delivered the opinion of the Court.
A group of buyers of newly issued securities have filed an antitrust lawsuit against underwriting firms that market and distribute those issues. The buyers claim that the underwriters unlawfully agreed with one another that they would not sell shares of a popular new issue to a buyer unless that buyer committed (1) to buy additional shares of that security later at escalating prices (a practice called “laddering”), (2) to pay unusually high commissions on subsequent security purchases from the underwriters, or (3) to purchase from the underwriters other less desirable securities (a practice called “tying”). The question before us is whether there is a “‘plain repugnancy’” between these antitrust claims and the federal securities law. See Gordon v. New York Stock Exchange, Inc., 422 U. S. 659, 682 (1975) (quoting United States v. Philadelphia Nat. Bank, 374 U. S. 321, 350-351 (1963)). We conclude that there is. Consequently we must interpret the securities laws as implicitly precluding the application of the antitrust laws to the conduct alleged *268 in this case. See 422 U. S., at 682, 689, 691; see also United States v. National Assn. of Securities Dealers, Inc., 422 U. S. 694 (1975) (NASD); Silver v. New York Stock Exchange, 373 U. S. 341 (1963).
I
A
The underwriting practices at issue take place during the course of an initial public offering (IPO) of shares in a company. An IPO presents an opportunity to raise capital for a new enterprise by selling shares to the investing public. A group of underwriters will typically form a syndicate to help market the shares. The syndicate -will investigate and estimate likely market demand for the shares at various prices. It will then recommend to the firm a price and the number of shares it believes the firm should offer. Ultimately, the syndicate will promise to buy from the firm all the newly issued shares on a specified date at a fixed, agreed-upon price, which price the syndicate will then charge investors when it resells the shares. When the syndicate buys the shares from the issuing firm, however, the firm gives the syndicate a price discount, which amounts to the syndicate’s commission. See generally L. Loss & J. Seligman, Fundamentals of Securities Regulation 66-72 (4th ed. 2001).
At the heart of the syndicate’s IPO marketing activity lie its efforts to determine suitable initial share prices and quantities. At first, the syndicate makes a preliminary estimate that it submits in a registration statement to the Securities and Exchange Commission (SEC). It then conducts a “road show” during which syndicate underwriters and representatives of the offering firm meet potential investors and engage in a process that the industry calls “bookbuilding.” During this time, the underwriters and firm representatives present information to investors about the company and the stock. And they attempt to gauge the strength of the investors’ interest in purchasing the stock. For this purpose, under *269 writers might well ask the investors how their interest would vary depending upon price and the number of shares that are offered. They will learn, among other things, which investors might buy shares, in what quantities, at what prices, and for how long each is likely to hold purchased shares before selling them to others.
On the basis of this kind of information, the members of the underwriting syndicate work out final arrangements with the issuing firm, fixing the price per share and specifying the number of shares for which the underwriters will be jointly responsible. As we have said, after buying the shares at a discounted price, the syndicate resells the shares to investors at the fixed price, in effect earning its commission in the process.
B
In January 2002, respondents, a group of 60 investors, filed two antitrust class-action lawsuits against petitioners, 10 leading investment banks. They sought relief under § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1; § 2(c) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1527, 15 U. S. C. § 13(c); and state antitrust laws. App. 1,14. The investors stated that between March 1997 and December 2000 the banks had acted as underwriters, forming syndicates that helped execute the IPOs of several hundred technology-related companies. Id., at 22. Respondents’ antitrust complaints allege that the underwriters “abused the ... practice of combining into underwriting syndicates” by agreeing among themselves to impose harmful conditions upon potential investors — conditions that the investors apparently were willing to accept in order to obtain an allocation of new shares that were in high demand. Id., at 12.
These conditions, according to respondents, consist of a.requirement that the investors pay “additional anticompetitive charges” over and above the agreed-upon IPO share price plus underwriting commission. In particular, these addi *270 tional charges took the form of (1) investor promises “to place bids ... in the aftermarket at prices above the IPO price” (i e., “laddering” agreements); (2) investor “commitments to purchase other, less attractive securities” (i e., “tying” arrangements); and (3) investor payment of “non-competitively determined” (i. e., excessive) “commissions,” including the “purchas[e] of an issuer’s shares in follow-up or ‘secondary’ public offerings (for which the underwriters would earn underwriting discounts).” Id., at 12-13. The complaint added that the underwriters’ agreement to engage in some or all of these practices artificially inflated the share prices of the securities in question. Id., at 32.
The underwriters moved to dismiss the investors’ complaints on the ground that federal securities law impliedly precludes application of antitrust laws to the conduct in question. (Ihe antitrust laws at issue include the commercial bribery provisions of the Robinson-Patman Act.) The District Court agreed with petitioners and dismissed the complaints against them. See In re Initial Public Offering Antitrust Litigation, 287 F. Supp. 2d 497, 524-525 (SDNY 2003) (IPO Antitrust). The Court of Appeals for the Second Circuit reversed, however, and reinstated the complaints. 426 F. 3d 130, 170, 172 (2005). We granted the underwriters’ petition for certiorari. And we now reverse the judgment of the Court of Appeals.
II
A
Sometimes regulatory statutes explicitly state whether they preclude application of the antitrust laws. Compare, e. g., Webb-Pomerene Act, 15 U. S. C. § 62 (expressly providing antitrust immunity), with § 601(b)(1) of the Telecommunications Act of 1996, 47 U. S. C. § 152 (stating that antitrust laws remain applicable). See also Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U. S. 398, 406-407 (2004) (analyzing the antitrust saving clause of the *271 Telecommunications Act). Where regulatory statutes are silent in respect to antitrust, however, courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws. Those determinations may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws. Compare Gordon, 422 U. S., at 689 (finding implied preclusion of antitrust laws); and NASD, 422 U. S., at 729-730 (same), with Otter Tail Power Co. v. United States, 410 U. S. 366, 374-375 (1973) (finding no implied immunity); Philadelphia Nat. Bank, 374 U. S., at 352 (same); and Silver, 373 U. S., at 360 (same). See also Phonetele, Inc. v. American Tel. & Tel. Co., 664 F. 2d 716, 727 (CA9 1981).
Three decisions from this Court specifically address the relation of securities law to antitrust law. In Silver the Court considered a dealer’s claim that, by expelling him from the New York Stock Exchange, the exchange had violated the antitrust prohibition against group “boyeott[s].” 373 U. S., at 347. The Court wrote that, where possible, courts should “reconcilie] the operation of both [¿ e., antitrust and securities] statutory schemes . . . rather than holding one completely ousted.” Id., at 357. It also set forth a standard, namely, that “[r]epeal [of the antitrust laws] is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.” Ibid. And it held that the securities law did not preclude application of the antitrust laws to the claimed boycott insofar as the exchange denied the expelled dealer a right to fair procedures. Id., at 359-360.
In reaching this conclusion, the Court noted that the SEC lacked jurisdiction under the securities law “to review particular instances of enforcement of exchange rules”; that “nothing [was] built into the regulatory scheme which performs the antitrust function of insuring” that rules that in *272 jure competition are nonetheless “justified as furthering” legitimate regulatory “ends”; that the expulsion “would clearly” violate “the Sherman Act unless justified by reference to the purposes of the Securities Exchange Act”; and that it could find no such justifying purpose where the exchange took “anticompetitive collective action . . . without according fair proceduresId., at 357-358, 364 (emphasis added).
In Gordon the Court considered an antitrust complaint that essentially alleged “price fixing” among stockbrokers. It charged that members of the New York Stock Exchange had agreed to fix their commissions on sales under $500,000. And it sought damages and . an injunction forbidding future agreements. 422 U. S., at 661, and n. 3. The lawsuit was filed at a time when regulatory attitudes toward fixed stockbroker commissions were changing. The fixed commissions challenged in the complaint were applied during a period when the SEC approved of the practice of fixing broker-commission rates. But Congress and the SEC had both subsequently disapproved for the future the fixing of some of those rates. See id., at 690-691.
In deciding whether antitrust liability could lie, the Court repeated Silver’s general standard in somewhat different terms: It said that an “implied repeal” of the antitrust laws would be found only “where there is a ‘plain repugnancy between the antitrust and regulatory provisions.’ ” 422 U. S., at 682 (quoting Philadelphia Nat. Bank, supra, at 350-351). It then held that the securities laws impliedly precluded application of the antitrust laws in the case at hand. The Court rested this conclusion on three sets of considerations. For one thing, the securities law “gave the SEC direct regulatory power over exchange rules and practices with respect to the fixing of reasonable rates of commission.” 422 U. S., at 685 (internal quotation marks omitted). For another, the SEC had “taken an active role in review of proposed rate changes during the last 15 years,” and had engaged in “con *273 tinuing activity” in respect to the regulation of commission rates. Ibid. Finally, without antitrust immunity, “the exchanges and their members” would be subject to “conflicting standards.” Id., at 689.
This last consideration — the conflict — was complicated due to Congress’, and the agency’s, changing views about the validity of fixed commissions. As far as the past fixing of rates was concerned, the conflict was clear: The antitrust law had forbidden the very thing that the securities law had then permitted, namely, an anticompetitive ratesetting process. In respect to the fiiture, however, the conflict was less apparent. That was because the SEC’s new (congressionally authorized) prohibition of (certain) fixed rates would take effect in the near-term future. And after that time the SEC and the antitrust law would both likely prohibit some of the ratefixing to which the plaintiff’s injunction would likely apply. See id., at 690-691.
Despite the likely compatibility of the laws in the future, the Court nonetheless expressly found conflict The conflict arose from the fact that the law permitted the SEC to supervise the competitive setting of rates and to “reintroducfe] . . . fixed rates,” id., at 691 (emphasis added), under certain conditions. The Court consequently wrote that “failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates.” Ibid. The upshot is that, in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect to a practice that both antitrust law and securities law might forbid.
In NASD the Court considered a Department of Justice antitrust complaint claiming that mutual fund companies had agreed with. securities broker-dealers (1) to fix “resale” prices, i. e., the prices at which a broker-dealer would sell a mutual fund’s shares to an investor or buy mutual fund shares from a fund investor (who wished to redeem the shares); (2) to fix other terms of sale including those related *274 to when, how, to whom, and from whom the broker-dealers might sell and buy mutual fund shares; and (3) to prohibit broker-dealers from freely selling to, and buying shares from, one another. See 422 U. S., at 700-703.
The Court again found “clear repugnancy,” and it held that the securities law, by implication, precluded all parts of the antitrust claim. Id., at 719. In reaching this conclusion, the Court found that antitrust law (e. g., forbidding resale price maintenance) and securities law (e. g., permitting resale price maintenance) were in conflict. In deciding that the latter trumped the former, the Court relied upon the same kinds of considerations it found determinative in Gordon. In respect to the last set of allegations (restricting a free market in mutual fund shares among brokers), the Court said that (1) the relevant securities law “enables [the SEC] to monitor the activities questioned”; (2) “the history of Commission regulations suggests no laxity in the exercise of this authority”; and hence (3) allowing an antitrust suit to proceed that is “so directly related to the SEC’s responsibilities” would present “a substantial danger that [broker-dealers and other defendants] would be subjected to duplicative and inconsistent standards.” NASD, 422 U. S., at 734-735.
As to the other practices alleged in the complaint (concerning, e.g., resale price maintenance), the Court emphasized that (1) the securities law “vested in the SEC final authority to determine whether and to what extent” the relevant practices “should be tolerated,” id., at 729; (2) although the SEC has not actively supervised the relevant practices, that is only because the statute “reflects a cléar congressional determination that, subject to Commission oversight, mutual funds should be allowed to retain the initiative in dealing with the potentially adverse effects of disruptive trading practices,” id., at 727; and (3) the SEC has supervised the funds insofar as its “acceptance of fund-initiated restrictions for more than three decades . . . manifests an informed ad *275 ministrative judgment that the contractual restrictions . . . were appropriate means for combating the problems of the industry,” id., at 728. The Court added that, in these respects, the SEC had engaged in “precisely the kind of administrative oversight of private practices that Congress contemplated.” Ibid.
As an initial matter these eases make clear that Justice Thomas is wrong to regard §§77p(a) and 78bb(a) as saving clauses so broad as to preserve all antitrust actions. See post, p. 287 (dissenting opinion). The United States advanced the same argument in Gordon. See Brief for United States as Amicus Curiae in Gordon v. New York Stock Exchange, Inc., O. T. 1974, No. 74-304, pp. 8, 42. And the Court, in finding immunity, necessarily rejected it. See also NASD, supra, at 694 (same holding); Herman & MacLean v. Huddleston, 459 U. S. 375, 383 (1983) (finding saving clause applicable to overlap between securities laws where that “overlap [was] neither unusual nor unfortunate” (internal quotation marks omitted)). Although one party has made the argument in this Court, it was not presented in the courts below. And we shall not reexamine it.
This Court’s prior decisions also make clear that, when a court decides whether securities law precludes antitrust law, it is deciding whether, given context and likely consequences, there is a “clear repugnancy” between the securities law and the antitrust eomplaint — or as we shall subsequently describe the matter, whether the two are “clearly incompatible.” Moreover, Gordon and NASD, in finding sufficient incompatibility to warrant an implication of preclusion, have treated the following factors as critical: (1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, *276 duties, privileges, or standards of conduct. We also note (4) that in Gordon and NASD the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate.
B
These principles, applied to the complaints before us, considerably narrow our legal task. For the parties cannot reasonably dispute the existence here of several of the conditions that this Court previously regarded as crucial to finding that the securities law impliedly precludes the application of the antitrust laws.
First, the activities in question here — the underwriters’ efforts jointly to promote and to sell newly issued securities — is central to the proper functioning of well-regulated capital markets. The IPO process supports new firms that seek to raise capital; it helps to spread ownership of those firms broadly among investors; it directs capital flows in ways that better correspond to the public’s demand for goods and services. Moreover, financial experts, including the securities regulators, consider the general kind of joint underwriting activity at issue in this case, including road shows and bookbuilding efforts essential to the successful marketing of an IPO. See Memorandum Amicus Curiae of SEC in IPO Antitrust, Case No. 01 CIV 2014 (WHP) (SDNY), pp. 15,39-40, App. D to Pet. for Cert. 124a, 138a, 155a-157a (hereinafter Brief for SEC). Thus, the antitrust complaints before us concern practices that lie at the very heart of the securities marketing enterprise.
Second, the law grants the SEC authority to supervise all of the activities here in question. Indeed, the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which underwriters engage. See, e. g., 15 U. S. C. §§ 77b(a)(3), 77j, 77z-2 (granting SEC power to regulate the process of bookbuilding, solicitations *277 of “indications of interest,” and communications between underwriting participants and their customers, including those that occur during road shows); § 78o(c)(2)(D) (granting SEC power to define and prevent through rules and regulations acts and practices that are fraudulent, deceptive, or manipulative); §78i(a)(6) (similar); §78j(b) (similar). Private individuals who suffer harm as a result of a violation of pertinent statutes and regulations may also recover damages. See §§ 78bb, 78u-4, 77k.
Third, the SEC has continuously exercised its legal authority to regulate conduct of the general kind now at issue. It has defined in detail, for example, what underwriters may and may not do and say during their road shows. Compare, e. g., Guidance Regarding Prohibited Conduct in Connection with IPO Allocations, 70 Fed. Reg. 19672 (2005), with Regulation M, 17 CFR §§242.100-242.105 (2006). It has brought actions against underwriters who have violated these SEC regulations. See Brief for SEC 13-14, App. D to Pet. for Cert. 136a-138a. And private litigants, too, have brought securities actions complaining of conduct virtually identical to the conduct at issue here; and they have obtained damages. See, e. g., In re Initial Pub. Offering Securities Litigation, 241 F. Supp. 2d 281 (SDNY 2003).
The preceding considerations show that the first condition (legal regulatory authority), the second condition (exercise of that authority), and the fourth condition (heartland securities activity) that were present in Gordon and NASD are satisfied in this case as well. Unlike Silver, there is here no question of the existence of appropriate regulatory authority, nor is there doubt as to whether the regulators have exercised that authority. Rather, the . question before us concerns the third condition: Is there a conflict that rises to the level of incompatibility? Is an antitrust suit such as this likely to prove practically incompatible with the SEC’s administration of the Nation’s securities laws?
*278 III
A
Given the SEC's comprehensive authority to regulate IPO underwriting syndicates, its active and ongoing exercise of that authority, and the undisputed need for joint IPO underwriter activity, we do not read the complaints as attacking the bare existence of IPO underwriting syndicates or any of the joint activity that the SEC considers a necessary component of IPO-related syndicate activity. See Brief for SEC 15,39-40, App. D to Pet. for Cert. 138a, 155a-157a. See also IPO Antitrust, 287 F. Supp. 2d, at 507 (discussing the history of syndicate marketing of IPOs); App. 12 (complaint attacks underwriters “abus[ej” of “the preexisting practice of combining into underwriting syndicates” (emphasis added)); H. R. Rep. No. 1383, 73d Cong., 2d Sess., 6-7 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 5 (1934) (law must give to securities agencies freedom to regulate agreements among syndicate members). Nor do we understand the complaints as questioning underwriter agreements to fix the levels of their commissions, whether or not the resulting price is “excessive.” See Gordon, 422 U. S., at 688-689 (securities law conflicts with, and therefore precludes, antitrust attack on the fixing of commissions where the SEC has not approved, but later might approve, the practice).
We nonetheless can read the complaints as attacking the manner in which the underwriters jointly seek to collect “excessive” commissions. The complaints attack underwriter efforts to collect commissions through certain practices (i. e., laddering, tying, collecting excessive commissions in the form of later sales of the issued shares), which according to respondents the SEC itself has already disapproved and, in all likelihood, will not approve in the foreseeable future. In respect to this set of claims, they contend that there is no possible “conflict” since both securities law and antitrust law aim to prohibit the same undesirable activity. Without a *279 conflict, they add, there is no “repugnance” or “incompatibility,” and this Court may not imply that securities law precludes an antitrust suit.
B
We accept the premises of respondents’ argument — that the SEC has full regulatory authority over these practices, that it has actively exercised that authority, but that the SEC has disapproved (and, for argument’s sake, we assume that it will continue to disapprove) the conduct that the antitrust complaints attack. Nonetheless, we cannot accept respondents’ conclusion. Rather, several considerations taken together lead us to find that, even on these prorespondent assumptions, securities law and antitrust law are clearly incompatible.
First, to permit antitrust actions such as the present one still threatens serious seeurities-related harm. For one thing, an unusually serious legal line-drawing problem remains unabated. In the present context Only a fine, complex, detailed line separates activity that the SEC permits or encourages (for which respondents must concede antitrust immunity) from activity that the SEC must (and inevitably will) forbid (and which, on respondents’ theory, should be open to antitrust attack).
For example, in respect to “laddering” the SEC forbids an underwriter to “[s]olici[t] customers prior to the completion of the distribution regarding whether and at what price and in what quantity they intend to place immediate aftermarket orders for IPO stock,” 70 Fed. Reg. 19675-19676 (emphasis deleted); 17 CFR §§242.100-242.105. But at the same time the SEC permits, indeed encourages, underwriters (as part of the “bookbuilding” process) to “inquir[e] as to a customer’s desired future position in the longer term (for example, three to six months), and the price or prices at which the customer might accumulate that position without reference to immediate aftermarket activity.” 70 Fed. Reg. 19676.
*280 It will often be difficult for someone who is not familiar with accepted syndicate practices to determine with confidence whether an underwriter has insisted that an investor buy more shares in the immediate aftermarket (forbidden), or has simply allocated more shares to an investor willing to purchase additional shares of that issue in the long run (permitted). And who but a securities expert could say whether the present SEC rules set forth a virtually permanent line, unlikely to change in ways that would permit the sorts of “laddering-like” conduct that it now seems to forbid? Cf. Gordon, supra, at 690-691.
Similarly, in respect to “tying” and other efforts to obtain an increased commission, from future sales, the SEC has sought to prohibit an underwriter “from demanding ... an offer from [its] customers of any payment or other consideration [such as the purchase of a different security] in addition to the security’s stated consideration.” 69 Fed. Reg. 75785 (2004). But the SEC would permit a firm to “allocate] IPO shares to a customer because the customer has separately retained the firm for other services, when the customer has not paid excessive compensation in relation to those services.” Ibid., and n. 108. The National Association of Securities Dealers (NASD), over which the SEC exercises supervisory authority, has also proposed a rule that would prohibit a member underwriter from “offering or threatening to withhold” IPO shares “as consideration or inducement for the receipt of compensation that is excessive in relation to the services provided.” Id., at 77810. The NASD would allow, however, a customer legitimately to compete for IPO shares by increasing the level and quantity of compensation it pays to the underwriter. See ibid. (describing NASD Proposed Rule 2712(a)).
Under these standards, to distinguish what is forbidden from what is allowed requires an understanding of just when, in relation to services provided, a commission is “excessive,” indeed, so “excessive” that it will remain permanently for *281 bidden, see Gordon, 422 U. S., at 690-691. And who but the SEC itself could do so with confidence?
For another thing, evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical. Consider, for instance, a conversation between an underwriter and an investor about how long an investor intends to hold the new shares (and at what price), say, a conversation that elicits comments concerning both the investor’s short and longer term plans. That exchange might, as a plaintiff sees it, provide evidence of an underwriter’s insistence upon “laddering” or, as a defendant sees it, provide evidence of a lawful effort to allocate shares to those who will hold them for a longer time. See Brief for United States as Amicus Curiae 27.
Similarly, the same somewhat ambiguous conversation might help to establish an effort to collect an unlawfully high commission through atypically high commissions on later sales or through the sales of less popular stocks. Or it might prove only that the underwriter allocates more popular shares to investors who will help stabilize the aftermarket share price. See, e. g., Department of Enforcement v. Respondent, Disciplinary Proc. No. CAF030014 (NASD Hearing Panel, Mar. 3, 2006), pp. 12-13 (redacted decision), called for review, Complaint No. CAF030014 (NASD Nat. Adjudicatory Council, Apr. 11, 2006).
Further, antitrust plaintiffs may bring lawsuits throughout the Nation in dozens of different courts with different nonexpert judges and different nonexpert juries. In light of the nuanced nature of the evidentiary evaluations necessary to separate the permissible from the impermissible, it will prove difficult for those many different courts to reach consistent results. And, given the fact-related nature of many such evaluations, it will also prove difficult to ensure that the different courts evaluate similar faet patterns consistently. The result is an unusually high risk that different *282 courts will evaluate similar factual circumstances differently. See Hovenkamp, Antitrust Violations in Securities Markets, 28 J. Corp. L. 607, 629 (2003) (“Once regulation of an industry is entrusted to jury trials, the outcomes of antitrust proceedings will be inconsistent with one another ... ”).
Now consider these factors together — the fine securities-related lines separating the permissible from the impermissible; the need for securities-related expertise (particularly to determine whether an SEC rule is likely permanent); the overlapping evidence from which reasonable but contradictory inferences may be drawn; and the risk of inconsistent court results. Together these factors mean there is no practical way to confine antitrust suits so that they challenge only activity of the kind the investors seek to target, activity that is presently unlawful and will likely remain unlawful under the securities law. Rather, these factors suggest that antitrust courts are likely to make unusually serious mistakes in this respect. And the threat of antitrust mistakes, i e., results that stray outside the narrow bounds that plaintiffs seek to set, means that underwriters must act in ways that will avoid not simply conduct that the securities law forbids (and will likely continue to forbid), but also a wide range of joint conduct that the securities law permits or encourages (but which they fear could lead to an antitrust lawsuit and the risk of treble damages). And therein lies the problem.
This kind of problem exists to some degree in respect to other antitrust lawsuits. But here the factors we have mentioned make mistakes unusually likely (a matter relevant to Congress’ determination of which institution should regulate a particular set of market activities). And the role that joint conduct plays in respect to the marketing of IPOs, along with the important role IPOs themselves play in relation to the effective functioning of capital markets, means that the securities-related costs of mistakes is unusually high. It is no wonder, then, that the SEC told the District Court (con *283 sistent with what the Government tells us here) that a “failure to hold that the alleged conduct was immunized would threaten to disrupt the full range of the Commission’s ability to exercise its regulatory authority,” adding that it would have a “chilling effect” on “lawful joint activities ... of tremendous importance to the economy of the country.” Brief for SEC 39-40, App. D to Pet. for Cert. 157a.
We believe it fair to conclude that, where conduct at the core of the marketing of new securities is at issue; where securities regulators proceed with great care to distinguish the encouraged and permissible from the forbidden; where the threat of antitrust lawsuits, through error and disincentive, could seriously alter underwriter conduct in undesirable ways, to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets.
Second, any enforcement-related need for an antitrust lawsuit is unusually small. For one thing, the SEC actively enforces the rules and regulations that forbid the conduct in question. For another, as we have said, investors harmed by underwriters’ unlawful practices may bring lawsuits and obtain damages under the securities law. See supra, at 276-277. Finally, the SEC is itself required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations. And that fact makes it somewhat less necessary to rely upon antitrust actions to address anticompetitive behavior. See 15 U. S. C. § 77b(b) (instructing the SEC to consider, “in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation”); § 78w(a)(2) (the SEC “shall consider among other matters the impact any such rule or regulation would have on competition”); Trinko, 540 U. S., at 412 (“[T]he additional benefit to competition provided by antitrust enforcement will tend to be small” where other laws and regulatory structures are “designed to deter and remedy anticompetitive harm”).
*284 We also note that Congress, in an effort to weed out unmeritorious securities lawsuits, has recently tightened the procedural requirements that plaintiffs must satisfy when they file those suits. To permit an antitrust lawsuit risks circumventing these requirements by permitting plaintiffs to dress what is essentially a securities complaint in antitrust clothing. See generally Private Securities Litigation Reform Act of 1995,109 Stat. 737; Securities Litigation Uniform Standards Act of 1998,112 Stat. 3227.
In sum, an antitrust action in this context is accompanied by a substantial risk of injury to the securities markets and by a diminished need for antitrust enforcement to address anticompetitive conduct. Together these considerations indicate a serious conflict between, on the one hand, application of the antitrust laws and, on the other, proper enforcement of the securities law.
We are aware that the Solicitor General, while recognizing the conflict, suggests a procedural device that he believes will avoid it (in effect, a compromise between the differing positions that the SEC and Antitrust Division of the Department of Justice took in the courts below). Compare Brief for Dept, of Justice, Antitrust Division, as Amicus Curiae in Case No. 01 CIV 2014, p. 23 (seeking no preclusion of the antitrust laws), with Brief for SEC 39-40, App. D to Pet. for Cert. 155a-157a (seeking total preclusion of the antitrust laws). He asks us to remand this case to the District Court so that it can determine “whether respondents’ allegations of prohibited conduct can, as a practical matter, be separated from conduct that is permitted by the regulatory scheme,” and in doing so, the lower court should decide whether SEC-permitted and SEC-prohibited conduct are “inextricably intertwined.” See Brief for United States as Amicus Curiae 9, 26. The Solicitor General fears that otherwise, we might read the law as totally precluding application of the antitrust law to underwriting syndicate behavior, even were underwriters, say, overtly to divide markets.
*285 The Solicitor General’s proposed disposition, however, does not convincingly address the concerns we have set forth here — the difficulty of drawing a complex, sinuous line separating securities-permitted from securities-forbidden conduct, the need for securities-related expertise to draw that line, the likelihood that litigating parties will depend upon the same evidence yet expect courts to draw different inferences from it, and the serious risk that antitrust courts will produce inconsistent results that, in turn, will overly deter syndicate practices important in the marketing of new issues. (We also note that market divisions appear to fall well outside the heartland of activities related to the underwriting process than the conduct before us here, and we express no view in respect to that kind of activity.)
The upshot is that all four elements present in Gordon are present here: (1) an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes. We therefore conclude that the securities laws are “clearly incompatible” with the application of the antitrust laws in this context.
The Second Circuit’s contrary judgment is
Reversed.
Justice Kennedy took no part in the consideration or decision of this case.