Kirk **DAHL, et al., Individually and on Behalf of All Others Similarly Situated, Plaintiffs**

v.

**BAIN CAPITAL PARTNERS, LLC, et al., Defendants.**

**Civil Action No. 07–12388–EFH.**

United States District Court, D. Massachusetts.

Dec. 15, 2008.

Charles N. Nauen, Karen H. Riebel, Richard A. Lockridge, W. Joseph Bruckner, Lockridge Grindal Nauen P.L.L.P., K. Craig Wildfang, Stacey Slaughter Robins, Kaplan, Miller & Ciresi LLP, Thomas B. Hatch, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, David E. Marder, Meghan E. Walt Robins, Kaplan, Miller & Ciresi L.L.P., Boston, MA, David R. Scott, Scott & Scott LLP, Colchester, CT, George C. Aguilar, Robbins Umeda & Fink LLP, Hal Cunningham, Scott & Scott LLP, Jack Landskroner, Paul Grieco, Landskroner Grieco Madden, Ltd., Cleveland, OH, J. Gerard Stranch, IV, Branstetter, Stranch & Jennings, PLLC, Nashville, TN, Mary K. Blasy, David W. Mitchell, Elisabeth A. Bowman, Samantha A. Smith, Susan G. Taylor, Coughlin Stoia Gellar Rudman & Robbins LLP, Brian J. Robbins, Robbins Umeda & Fink LLP, Christopher M. Burke, Kristen M. Anderson, Scott & Scott LLP, San Diego, CA, for Plaintiffs.

Craig S. Primis, Michael F. Williams, Thomas D. Yannucci, Kirkland & Ellis LLP, Hillary C. Mintz, Peter C. Thomas, Reynelle Brown Staley, Simpson Thacher & Bartlett LLP, James C. Egan, Jr., Carrie M. Anderson, Weil Gotshal & Manges, LLP, John E. Scribner, Steven A. Newborn, Weil, Gotshal & Manges LLP, R. Hewitt Pate, Ryan Shores, Hunton & Williams LLP, Franklin R. Liss, John A. Freedman, Sarah A. Friedman, William J. Baer, Arnold & Porter LLP, Bernard A. Nigro, Jr., Willkie Farr & Gallagher LLP, Amanda Reeves, Marcellus Williamson, William Sherman, Latham & Watkins LLP, Ian Simmons, Richard Parker, O'Melveny & Myers LLP, Washington, DC, James H. Mutchnik, Kirkland & Ellis LLP, Dane A. Drobny, Michael P. Mayer, Winston and Strawn LLP, Chicago, IL, John D. Hanify, Michael Thomas Marcucci, Hanify & King, P.C., Kevin M. McGinty, Meredith M. Leary, Steven J. Torres, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, John D. Donovan, Jr., Ropes & Gray LLP, James R. Carroll, Kurt W. Hemr, Skadden, Arps, Slate, Meagher & Flom LLP, Ian D. Roffman, Jonathan L. Kotlier, Nutter, McClennen & Fish, LLP, James W. Matthews, Sherin and Lodgen LLP, Robert J. Muldoon, Jr., Sherin & Lodgen LLP, James C. Burling, Wilmer Hale LLP, Boston, MA, Kevin J. Arquit, Joseph F. Tringali, Paul C. Gluckow, Simpson, Thacher & Bartlett LLP, Austin F. McCullough, Gandolfo V. Diblasi, Julia M. Guaragna, Stephanie G. Wheeler, Sullivan & Cromwell LLP, Daniel M. Segal, Jerome S. Fortinsky, Kenneth M. Kramer, Wayne Dale Collins, Shearman & Sterling LLP, Douglas H. Flaum, Michael B. deLeeuw, Peter S. Guryan, Fried, Frank, Harris, Shriver & Jacobson LLP, Wesley R. Powell, Hunton & Williams LLP, Arun S. Subramanian, Susman Godfrey L.L.P., Alan J. Weinschel, Claire L.M. Webb, Eric S. Hochstadt, Fiona Schaeffer, Helene D. Jaffe, Thomas C. Frongillo, Weil Gotshal & Manges, LLP, Raymond M. Sarola, Roger Netzer, Willkie Farr & Gallagher LLP, Kenneth Conboy, Latham & Watkins, Abby F. Rudzin Jonathan Rosenberg, O'Melveny & Myers, LLP, New York, NY, H. Lee Godfrey, Harry P. Susman, Sus-

man Godfrey LLP, Houston, TX, for Defendants.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

This case comes before the court on Defendants' Joint Motion to Dismiss the Third Amended Complaint (Docket No. 127) pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants provide two (2) grounds on which the complaint should be dismissed. First, they argue that since the conduct at issue is regulated by the Securities and Exchange Commission ("SEC"), the plaintiffs claims are preempted from consideration under the antitrust laws. Second, the defendants argue that the plaintiffs have failed to properly plead a Sherman Act § 1 claim. The court rules that both of these arguments are without merit and for the reasons set forth below denies the motion on both grounds.

*Background*

Plaintiffs bring this action claiming that the defendants illegally colluded in their purchase of companies (the "Target Companies") as part of leveraged buyouts ("LBOs"). The plaintiffs identify this illegal collusion as the "Overarching Conspiracy." The plaintiffs (the "Shareholders") include a trust, a public retirement trust fund, and a group of five (5) individuals that owned shares in companies that the defendants purchased. The Shareholders bring this action on behalf of a class, which includes all persons who have an ownership interest in securities in any publicly listed company traded on any United States securities market or exchange. Additionally, the Shareholders include a group of sub-classes that sold their shares in connection with five (5) transactions.

The defendants (the "PE Firms") are 17 firms, most of which are private equity firms and the rest of which are affiliated with certain of these private equity firms.[1]

This is an antitrust case under § 1 of the Sherman Act, and §§ 4 and 16 of the Clayton Act. The Shareholders allege that the PE Firms conspired to pay less than fair value for the Target Companies, which in turn deprived the Target Companies' Shareholders of the true value of their shares upon sale of the Target Companies. The Shareholders' claim of conspiracy is quite expansive; this suit includes all LBOs involving the PE Firms that totaled more than $2.5 billion and occurred between 2003 and 2008.[2] The transactions at issue here were "club deals," whereby two or more PE Firms join together to conduct an LBO. The Shareholders do not contest the legality of club deals, but instead contest what they characterize as illegal agreements between the PE Firms to allocate the LBO market on a wide scale.

The Shareholders' complaint alleges, with specificity, nine (9) transactions, which the Shareholders claim illustrate the Overarching Conspiracy. The nine (9) companies purchased as a part of these transactions are a diverse group. The group includes a department store company, a cinema operator and an energy company. The Shareholders plead that the PE Firms carried out the Overarching Conspiracy by, *inter alia,* (1) submitting sham bids, (2) agreeing not to submit bids, (3) granting management certain incentives, and (4) including "losing" bidders in the final transaction.

*Decision*

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") is used to dismiss actions

---

1.  Pursuant to an Order of Dismissal issued by this court on November 20, 2008, this case presently includes 13 defendants.

2.  The Shareholders represented in the November 13, 2008 motion hearing that this case could include up to, but no more than, 36 transactions. Transcript of Oral Argument, 126.

in which the plaintiff has failed to state a claim upon which relief can be granted. Dismissal by this rule eliminates lawsuits that lack the most basic and necessary element of a lawsuit: a legal remedy. *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Given that a Rule 12(b)(6) decision concerns only legal remedies, the court must accept as true all factual allegations contained in the complaint in reviewing a Rule 12(b)(6) motion to dismiss. *United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

The PE Firms claim that there are two (2) viable grounds for dismissing this action under Rule 12(b)(6). First, they claim that the Shareholders lack a legal remedy because the SEC supervises the transactions at issue here, thereby pre-empting regulation under the antitrust laws. Second, the PE Firms claim that the Shareholders lack a legal remedy because they have failed to properly plead a claim under § 1 of the Sherman Act.

The PE Firms argue that the Shareholders have no legal remedy to pursue an antitrust claim under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264, 127 S.Ct. 2383, 168 L.Ed.2d 145 (2007). *Billing* stands for SEC pre-emption of the antitrust laws when the questioned behavior is regulated by the SEC. *Billing* follows a long line of cases dealing with SEC pre-emption and this precedent shows that pre-emption is met with caution by the United States Supreme Court (the "Supreme Court" or "Court"). *Billing*, 127 S.Ct. at 2389–90.

For instance, the Court noted in *Billing* its warning in the earlier case of *Silver v. New York Stock Exchange* that pre-emption should be used minimally in order to allow simultaneous operation of the securities and antitrust laws as much as possible. *Id.* (quoting *Silver*, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)). *Billing* involved the sale of securities by syndicates of underwriters as part of initial public offerings ("IPOs"). *Id.* at 2388. The Supreme Court ruled that pre-emption applied because the securities and antitrust laws were "clearly incompatible" with one another. *Id.* at 2397. To define "clear incompatibility," the Supreme Court enunciated four (4) factors: (1) whether the challenged practices lie squarely within an area of financial market activity that the securities laws seek to regulate; (2) the existence of regulatory authority under the securities laws to supervise the activities in question; (3) evidence that the responsible regulatory entities exercise that authority; and (4) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct. *Id.* at 2392.

*Billing* resulted in pre-emption because all four of these factors were satisfied. Under the first factor, the court evaluates whether the activities in question are those sought to be regulated by the securities laws. *Id.* The securities laws regulate the nation's securities exchanges. *Silver*, 373 U.S. at 349, 83 S.Ct. 1246. Securities exchanges are a vital element of the United States economy; they serve as the channel through which securities are bought and sold. *Id.* Thus, the securities laws directly regulate the sale of securities. The securities laws unquestionably regulated the activities in question in *Billing* because IPOs consist of the sale of securities. *Billing*, 127 S.Ct. at 2392. IPOs occur when a company is first established and securities are offered for sale to the general public. More specifically, the Supreme Court found that underwriters' efforts jointly to promote and sell newly issued securities clearly constituted financial market activity that the securities laws sought to regulate. *Id.* Therefore, the first factor was met.

Under the second factor, the court determines whether a regulatory authority exists to supervise the activities in question. The Supreme Court concluded that the SEC was a regulatory body charged with regulating the underwriters' activities. The Court came to this decision based on the SEC's visible regulation of the IPOs. *Id.* The Court highlighted the SEC's oversight of book-building, solicitations of "indications of interests," and communications between underwriting participants and their customers as evidence of the agency's regulation. *Id.* at 2393. The second factor also was satisfied.

The third factor assesses whether the regulatory body exercises its authority. *Id.* at 2392. The Supreme Court found that the SEC had continuously regulated the IPO process by passing its own regulations and bringing actions against parties for violating these regulations. *Id.* at 2393. Thus, the third factor also was met. The fourth and final factor considers whether application of both the securities and antitrust laws would create a conflict. *Id.* at 2392. After thoroughly reviewing this factor, the Supreme Court found that a conflict would exist here. The Court reasoned that (1) the need for securities-related expertise here, (2) the fine lines between what is permissible versus what is impermissible in the eyes of the SEC, (3) the different inferences that could be drawn from evaluating the same facts under the securities and antitrust laws, and (4) the inconsistent judgments that could result between courts, together, created too large a conflict between the antitrust and securities laws. *Id.* at 2395. Therefore, a conflict existed here and SEC preemption was necessary.

■ Unlike *Billing*, this is not a case of pre-emption. All four factors of *Billing* are not satisfied applying the facts at hand. First, the securities laws do not govern the conduct at issue. *Billing's* first factor requires that the challenged practice lie squarely within an area of financial market activity that the securities laws seek to regulate. *Id.* at 2392. Private equity LBOs do not lie within an area of the financial market that the securities laws seek to regulate as their *private*, as opposed to public, nature leaves them untouched by the securities laws. This is different from *Billing*, in which the SEC enjoyed wide latitude over transactions occurring on the nation's securities exchanges. Here, the Shareholders maintain that the PE Firms carefully avoided SEC oversight. For instance, the Shareholders allege that both the PE Firms are exempt from regulation under the Investment Company Act, and the PE Firms' partners and employees are exempt from registration under the Investment Advisers Act. These two acts are prominent laws under which the SEC regulates the securities market. Therefore, the first *Billing* factor is not met.

Second, no regulatory authority exists to oversee these private equity transactions, as required under the second *Billing* factor. *Id.* In *Billing*, the SEC regulated the activities of the underwriters as part of IPOs, but no such regulatory authority operates here. The PE Firms assert that the many filings that a Target Company must make in conjunction with an LBO represents regulation by the SEC. This argument is unconvincing. The SEC does not substantively regulate the PE Firms, it merely requires certain disclosures be filed as part of an LBO transaction.[3] Re-

---

**3.** In a chart ("*Billing* Preemption Analysis") the PE Firms presented to the court during the motion hearing on November 13, 2008, they state themselves that in *Billing*, the SEC

regulated "underwriters' practices," while here the SEC only requires disclosures. This makes it very clear that the SEC had substan-

quiring disclosures is not nearly as substantial and invasive as the regulations practiced in *Billing*. Indeed, *Billing* was decided as it was because of the breadth of the SEC's jurisdiction over the activities in question. *Id.* Therefore, seeing that the SEC only required certain disclosures here, and that it did not substantively regulate the behavior in question, the second factor is not met. As understood under *Billing,* private equity transactions remain unregulated.[4]

The third factor considers whether the regulatory body exercises its authority. *Billing,* 127 S.Ct. at 2392. The court has already made clear that the SEC has no regulatory authority here, rendering the third factor inapplicable and ultimately unsatisfied. The court can quickly analyze the fourth factor, as well. The fourth factor calls for an evaluation of any conflict that may arise between the securities and antitrust laws if both were to be applied. *Id.* There can be no conflict here because the securities laws, as explained in the analysis of the first factor, are absent *vis-a-vis* private equity LBOs. Antitrust laws can be applied without any of the securities-related concerns raised by the Supreme Court in *Billing;* the fourth factor fails.

In sum, in finding pre-emption, the Supreme Court in *Billing* said that pre-emption was appropriate given that the SEC had authority to regulate IPOs extensively. *Id.* at 2393, 2397. In contrast, pre-emption does not apply here as the private nature of the LBOs at issue prevents the SEC from regulating these transactions. The securities and antitrust laws therefore are not "incompatible," and this case can proceed under the antitrust laws.

In addition to their argument that pre-emption bars this case from moving forward, the PE Firms also argue that the Shareholders have failed to properly plead a claim under § 1 of the Sherman Act. Insufficient pleading would leave the Shareholders without a legal remedy, which would mandate dismissal under Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") dictates what a plaintiff must plead in his complaint. Rule 8(a) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Meanwhile, § 1 forbids a "contract, combination . . ., or a conspiracy in restraint of trade or commerce." 15 U.S.C. § 1 (2008).

In *Twombly,* the Supreme Court interpreted what is required under Rule 8(a) in the context of a § 1 claim. *Twombly* held that there must be "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. Put more concisely, the Supreme Court said for a § 1 claim, Rule 8(a) requires "allegations plausibly suggesting agreement." *Id.* at 1966. Although the Supreme Court found the pleadings at issue in *Twombly* to be insufficient, the Court stressed that it was not increasing the pleading standard under Rule 8(a). *Id.* at 1974. Rather, the Court pointed out that a judge could let a case proceed beyond a motion to dismiss even if proof of the facts is improbable and the plaintiff is unlikely to prevail. *Id.* at 1965.

The Court granted the motion to dismiss in *Twombly* because the plaintiffs did not plead facts that the defendants came to an illegal agreement in violation of § 1. *Id.* at

tive regulatory authority in *Billing,* while here it does not.

**4.** The court notes that the District Court for the Western District of Washington also deter-

mined that pre-emption under *Billing* would not apply when the SEC does not regulate the substantive conduct at issue. *See Pa. Ave. Funds v. Borey,* 569 F.Supp.2d 1126, 1130 (W.D.Wash.2008).

1970. The plaintiffs in *Twombly* were two individuals who sued on a behalf of a putative class. This class consisted of all subscribers of local telephone and/or high speed internet services from February 8, 1996 to the time the suit was filed. The two individual plaintiffs in *Twombly* sued the four (4) major local telephone providers in the United States (referred to in the case as the Incumbent Local Exchange Carriers ("ILECs")), claiming that the ILECs conspired to prevent competition by newer local phone companies (Competitive Local Exchange Carriers ("CLECs")). *Id.* at 1962 n. 1. The ILECs resisted the entry of CLECs into the marketplace, but were under intense pressure from Congress to make room for them. *Id.* at 1961. Congress had enacted the Telecommunications Act of 1996 (the "1996 Act") with the goal of both easing access to the telecommunications market for CLECs, and generally promoting competition between the ILECs and CLECs. *See id.* Even as they mightily resisted it, the ILECs had no choice but to compete fairly with CLECs under the 1996 Act. It required the ILECs to give CLECs access to the ILECs' networks. *Id.*

The plaintiffs' complaint in *Twombly* rested on two grounds. First, they argued that the ILECs engaged in "parallel" anticompetitive conduct in their respective markets to prevent growth by CLECs. *Id.* at 1962. Parallel meant similar business practices. *See id.* The ILECs' parallel conduct included: (1) making unfair agreements with CLECs for access to the ILEC networks; (2) providing CLECs with inferior connections to the ILEC networks; (3) overcharging CLECs; and (4) billing CLECs in ways as to sabotage CLECs' relationships with their own customers. Second, the plaintiffs argued that the ILECs formed illegal agreements not to compete with one another. *Id.*

The Supreme Court found both grounds unpersuasive. First, it rejected the allegations of parallel conduct because there was nothing tying the parallel conduct of one ILEC to the parallel conduct of another ILEC; therefore, there was nothing "plausibly suggesting" an illegal agreement between the ILECs as § 1 requires. *Id.* at 1971. Second, the Court rejected the claim of an agreement between the ILECs not to compete on the lack of any specific allegation of such an agreement. *See id.* at 1972. The only specific facts alleged dealt with the first claim of parallel conduct. *Id.* at 1970–71. Having furnished no facts of an illegal agreement, the plaintiffs insufficiently pled their claims and the Supreme Court dismissed the case under Rule 12(b)(6). *Id.* at 1974.

■ This case is different. The Shareholders have pled enough facts for a § 1 claim that they meet the requirements under Rule 8(a), which in turn gives them a legal remedy. With a legal remedy in place, the Rule 12(b)(6) motion to dismiss must be denied. *Twombly* requires that a § 1 claim have enough facts "plausibly suggesting" an illegal agreement for a claim to be pled properly under Rule 8(a). *Id. Twombly* was dismissed under Rule 12(b)(6) because the plaintiffs proffered no allegation of an illegal agreement and thus were left with no legal remedy. *Id.* at 1970. The heart of the complaint rested on parallel conduct by each defendant and included no allegation of any illegal agreement tying the defendants' individual parallel conduct together. *Id.* at 1970–71. In contrast with *Twombly*, the circumstances here "plausibly suggest" that an illegal agreement existed in violation of § 1. The court comes to this conclusion based on the nine (9) specifically pled transactions. The presence of the same PE Firms in multiple transactions ties the PE Firms together in a way that the *Twombly* defendants were

not. This overlap in firms, coupled with the Shareholders' allegations that the PE Firms conspired to prevent open, competitive bidding for the Target Companies, "plausibly suggests" an illegal agreement here.

To illustrate that enough facts "plausibly suggest" an illegal agreement here, the court provides a few examples. For instance, Bain and Blackstone were the purchasers in the Michael's transaction and they also were among the consortium that purchased SunGuard. KKR and TPG were also purchasers in the SunGuard deal, while they both bid on the sale of Michael's. Goldman Capital was a purchaser in SunGuard, while its related entity, Goldman Sachs, served as an advisor in Michael's and SunGuard. Meanwhile, in the Neiman Marcus deal, KKR, Bain, and Blackstone were bidders, while TPG was one of the two ultimate purchasers. Goldman Sachs also served as an advisor in Neiman Marcus.

The court emphasizes that it makes no judgment on the merits of the Shareholders' case. In other words, it does not decide whether or not an illegal agreement in fact existed. Rather, the court observes its duty at the pleading stage to accept all facts pleaded as true, and to ascertain only whether the Shareholders have stated a legal remedy. *Gaubert*, 499 U.S. at 327, 111 S.Ct. 1267. Unlike *Twombly*, in which the plaintiffs presented no facts of an illegal agreement, the Shareholders have provided enough facts to "plausibly suggest" an illegal agreement. Their proper pleading under Rule 8(a) provides the Shareholders with a legal remedy under which to pursue their antitrust claims. The motion to dismiss on the grounds of improper pleading must be denied.

Contrary to the claims put forth by the PE Firms, no grounds exist to dismiss this case on the basis of (1) pre-emption or (2) improper pleading. Accordingly, Defendants' Joint Motion to Dismiss the Third Amended Complaint (Docket No. 127) is DENIED.[5]

*Discovery*

The court orders that the first stage of discovery shall be directed solely and exclusively to the nine (9) specified transactions alleged in the complaint, which transactions the Shareholders claim constitute indicia of the Overarching Conspiracy.

At the conclusion of the first stage of discovery, the court shall determine whether further discovery as to additional transactions is warranted. This determination shall be based on whether or not the first stage of discovery raises sufficient evidence of collusion on the part of the PE Firms.

If a second stage of discovery is warranted, the Shareholders shall move to amend the complaint in order to add additional transactions and defendants.

The parties shall agree upon a plan for the first stage of discovery and submit the discovery schedule to the court on or before 30 days from the date of this order.

The first stage of discovery shall be concluded within 12 months from the date of this order.

Defendants' Joint Motion to Dismiss the Third Amended Complaint (Docket No. 127) is DENIED. Discovery shall proceed as detailed in this order.

SO ORDERED.

---

5.  At this time, the court abstains from ruling on the motion to dismiss the unjust enrich- ment claim.