### In re SHORT SALE ANTITRUST LITIGATION.

No. 06 Civ. 2859(VM).

United States District Court,
S.D. New York.

Dec. 20, 2007.

Vincent R. Cappucci, Harold F. McGuire, Jr., Jeffrey Alan Klafter, Robert N Cappucci, Stephen D. Oestreich, Entwistle & Cappucci LLP, New York, NY, Shannon Lee Hopkins, Milberg Weiss Bershad & Schulman LLP (NYC), New York, NY, for Electronic Trading Group, LLC, plaintiff.

Andrew Jay Frackman, Brendan Joseph Dowd, O'Melveny & Myers LLP, New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Banc of America Securities, LLC, defendant.

Brian Lawrence Friedman, Harry Frischer, Stephen Leonard Ratner, Proskauer Rose LLP (NEW YORK), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Bear Stearns Companies, Inc., defendant.

Fraser Lee Hunter, Jr., Robert Bruce Mccaw, Wilmer, Cutler, Hale & Dorr, L.L.P. (NYC), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for CitiGroup, Inc., Credit Suisse (USA), Inc., defendants.

William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Deutsche Bank Securities, Inc., Merrill Lynch, Pierce Fenner, & Smith, Inc., Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley DW Inc., The Goldman Sachs Group, Inc., defendants.

Richard Howard Klapper, Richard C. Pepperman, II, Tracy Richelle High, Sullivan and Cromwell, LLP(NYC), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Goldman Sachs & Co., defendant.

Moses Silverman, Layaliza Klein Soloveichik, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Lehman Brothers, Inc., defendant.

Edmund Polubinski, III, Heather Marie Ward, Robert Frank Wise, Jr., William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Morgan Stanley & Co., Inc., defendant.

Andrew Brian Clubok, Jay Philip Lefkowitz, Maria Ginzburg, Kirkland & Ellis LLP (NYC), New York, NY, Eleanor R. Barrett, John R. Phillips, Kirkland & Ellis LLP, Washington, DC, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for UBS Financial Services, Inc., defendant.

Jonathan D Polkes, Weil, Gotshal & Manges LLP (NYC), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for CIBC World Markets Corp., defendant.

Richard Howard Klapper, Richard C. Pepperman, II, Tracy Richelle High, Sullivan And Cromwell, LLP(NYC), New York, NY, William Joseph Fenrich, Davis Polk & Wardwell, New York, NY, for Goldman Sachs Execution & Clearing, L.P., defendant.

Jeffrey Hoffman Drichta, Jon Randall Roellke, Clifford, Chance, US LLP (DC), Washington, DC, Mark Adam Kirsch, Clifford Chance US, LLP (NYC), New York, NY, for J.P. Morgan Chase & Co., J.P. Morgan Securities, Inc., defendants.

Daniel Benjamin Rapport, Katherine Lindsay Pringle, Lisa Swedenborg Getson, Friedman Kaplan Seiler & Adelman LLP, New York, NY, for Van Der Moolen Specialists USA, LLC., defendant.

Richard Howard Klapper, Richard C. Pepperman, II, Tracy Richelle High, Sullivan and Cromwell, LLP(NYC), New York, NY, for Goldman Sachs Group, Inc., defendant.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Electronic Trading Group L.L.C. ("ETG"), on behalf of itself and persons or entities similarly situated (collectively, "Class Members"), filed an Amended Class Action Complaint dated January 5, 2007 (the "Amended Complaint") against defendants Morgan Stanley & Co., Inc.; Morgan Stanley DW Inc. ("MSDW"); Bear Stearns Companies, Inc. ("Bear Stearns"); The Goldman Sachs Group, Inc.; Goldman Sachs & Co. ("GSC"); Goldman Sachs Execution & Clearing, L.P. ("GSEC"); UBS Financial Services, Inc. ("UBS"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); Citigroup Inc.; Citigroup Global Markets, Inc. ("CGM"); Credit Suisse (USA) Inc.; Credit Suisse Securities (USA) L.L.C. ("CSS"); Deutsche Bank Securities, Inc. ("Deutsche Bank"); Lehman Brothers, Inc. ("Lehman"); Banc of America Securities L.L.C. ("Banc of America"); Van der Moolen Specialists USA, L.L.C. ("Van der Moolen"); CIBC World Markets Corp. ("CIBC") (collectively, "Defendants"). ETG alleges that Defendants violated antitrust law, aided and abetted breach of fiduciary duty and were unjustly enriched, and that defendants MSDW, Bear Stearns, GSEC, GSC, UBS, Merrill Lynch, CGM, CSS, Deutsche Bank, Lehman, Banc of America, Van der Moolen, and CIBC (collectively, "Fiduciary Defendants") breached their fiduciary duties, in connection with certain short sale security transactions.

Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)"). For the reasons stated below, Defendants' motion is GRANTED.

## I. BACKGROUND

The following facts are taken from the Amended Complaint, which the Court accepts as true for the purpose of ruling on the motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)).

### A. *Operation of the Short Sale Securities Market*

Class Members have acted as short sellers ("Short Sellers") in short sale security transactions. In the short sale transactions at issue in this case, the Short Seller typically contacts its brokerage firm ("Seller's Broker") (*e.g.*, one of the Defendants), requesting that Seller's Broker lend particular securities ("Object Securities") to Short Seller. Short Seller then sells the Object Securities on the open market (to a "Purchaser") with the expectation that the Object Securities' market price will decline in the future. Later, Short Seller purchases like securities on the open market and transfers them to Seller's Broker, replacing the Object Securities it borrowed earlier and closing its position. If Short Seller was correct and the Object Securities' price declined, Short Seller profits from the difference between the price received from selling the Object Securities and the price paid when replacing like securities, less any fees and interest charged by Seller's Broker.

Before Short Seller can effect a short sale transaction, it must submit a borrowing request to the Seller's Broker securities loan desk (the "Loan Desk"), and pursuant to SEC regulations, the Loan Desk

is required to locate the securities available for borrowing. The Loan Desk may locate the Object Securities directly or through a finder, who operates as a third party intermediary assisting Seller's Broker by locating available Object Securities. If Seller's Broker uses a finder, Seller's Broker will typically charge short sellers "finders" or "locate" fees. If the Loan Desk locates the security directly, it may borrow the securities from its proprietary accounts, other brokerage firms (*e.g.*, another one of the Defendants), or (3) pension funds and institutional investors with significant long positions. Prior to Seller's Broker granting approval to execute the transaction, the Loan Desk must locate the Object Securities available for borrowing and inform Short Seller of the borrowing cost.

Until Short Seller replaces the borrowed securities, Short Seller pays Seller's Broker a daily borrowing fee. Absent the alleged conspiracy as described by the Class Members, each respective broker determines the amount of its borrowing fees and which securities are designated as "hard-to-borrow" (such securities that Defendants classified and presented to Class Members as hard-to-borrow are the "Class Securities"). When a broker designates a security as hard-to-borrow, it generally charges a higher borrowing fee.

Once the Loan Desk obtains the Object Securities, Short Seller can then effect electronic delivery through the purchaser's brokerage firm ("Purchaser's Broker"). Purchaser's Broker, like Seller's Broker, is also oftentimes one of the Defendants because Defendants collectively control virtually all of the securities lending market. If Seller's Broker does not deliver the securities to Purchaser's Broker by the settlement date, a failure-to-deliver occurs ("FTD").

### B. *Effect of Defendants' Alleged Conspiracy on Class Members' Short Sale Transactions*

ETG claims that from April 12, 2000, to the present, Class Members paid artificially inflated and unjustified fees to Defendants in connection with the borrowing and purported borrowing of Class Securities. ETG contends that Defendants entered into a combination, conspiracy, and agreement, through illegal price fixing and other wrongful conduct, to charge Class Members artificially inflated borrowing fees in connection with the borrowing of Class Securities, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Antitrust Claim"). ETG claims that, to achieve the alleged conspiracy's objective, Defendants engaged in daily communications via telephone, e-mail, and/or facsimile to agree on which securities to classify as hard-to-borrow and to fix the minimum borrowing rates for Class Securities. ETG alleges that Defendants charged Class Members improper fees for purportedly locating securities, when in many instances, Defendants failed to locate and/or borrow the securities.

ETG also claims that since brokers are not required to report the identities of Purchasers or Short Sellers to regulators and because two of the Defendants generally act as Seller's Broker and Purchaser's Broker, Defendants conspired not to enforce delivery of shorted securities, allowing persistent FTDs. ETG claims that instead of forcing delivery, Defendants maintain running IOU tallies among themselves with the Seller's Broker debiting Short Seller's account and Purchaser's Broker crediting Purchaser's account so as to make it appear as though the securities were delivered. Accordingly, a given Short Seller and Purchaser will not know whether the securities they sold and purchased were ever borrowed or delivered.

## II. DISCUSSION

### A. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court construes the complaint broadly, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). However, mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994) (citation and quotation marks omitted). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, —— U.S. ——, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

### B. ETG's ANTITRUST CLAIM

ETC's Antitrust Claim alleges that Defendants' conduct constituted a combination and conspiracy in restraint of trade, violating Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants, relying on the Supreme Court's recent decision in *Credit Suisse Secs. (USA) LLC v. Billing*, —— U.S. ——, 127 S.Ct. 2383, 168 L.Ed.2d 145 (2007) (*"Billing"*), argue that the securities laws implicitly preclude application of the antitrust laws to the conduct alleged in the Amended Complaint.

#### 1. Credit Suisse Secs. (USA) LLC v. Billing

In *Billing*, a group of securities buyers ("Buyers") filed an antitrust lawsuit against underwriting firms ("Underwriters") that market and distribute newly-issued securities ("IPOs"). Buyers claimed that Underwriters unlawfully conspired to not sell shares of popular IPOs to Buyers unless Buyers agreed to purchase additional shares at escalating prices, pay Underwriters unusually high commissions on subsequent security purchases, and/or purchase other less desirable securities from Underwriters (collectively, the "Conduct at Issue"), in violation of Section 1 of the Sherman Act, Section 2(c) of the Clayton Act, and state antitrust laws. Underwriters moved to dismiss Buyers' antitrust claims, arguing that the federal securities laws implicitly precluded application of the antitrust laws to the Conduct at Issue.

The Supreme Court stated that, where regulatory statutes are silent regarding preclusion of antitrust laws, the "courts must determine whether, and in what respects, [the regulatory statutes] implicitly preclude application of the antitrust laws." *Id.* at 2389. The securities laws implicitly preclude application of the antitrust laws, given the context and likely consequences, when the two are "clearly incompatible." *Id.* at 2392. The Court cited four critical factors (collectively, the "Factors") for determining within a given context whether securities laws and antitrust laws are clearly incompatible: (1) "the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law[s] seek[ ] to regulate" (the "First Factor"); (2) "the existence of regulatory authority under the securities law to supervise the activities in question" (the "Second Factor"); (3) "evidence that the responsible regulatory entities exercise that authority" (the "Third Factor"); and (4) "a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct" (the "Fourth Factor"). *Id.*

After applying the Factors, the *Billing* Court concluded that the federal securities laws implicitly precluded application of the antitrust laws to the Conduct at Issue.

Under the First Factor, the Court found that Underwriters' efforts to promote and sell IPOs were "central to the proper functioning of a well-regulated capital market" and "lie at the very heart of the securities marketing enterprise." *Id.* at 2392. Under the Second Factor, the Court found that the securities laws granted the United States Securities and Exchange Commission (the "SEC") authority to supervise the Conduct at Issue, including the power to "forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which underwriters engage." *Id.* at 2392–93 (*citing* 15 U.S.C. §§ 77b(a)(3), 77j, 77z–2, 78o(c)(2)(D), 78i(a)(6), and 78j(b)). Under the Third Factor, the Court found that the SEC has continuously exercised its authority to regulate the IPO transaction process, such as regulating IPO communications and bringing actions against underwriters who violate IPO regulations.

The Fourth Factor was the pivotal consideration before the Court. Buyers argued that there could be no conflict between the securities and antitrust laws because they both "aim to prohibit the same undesirable activity." *Id.* at 2393–94. The Court expressly accepted as true the Buyers' premise that the SEC has disapproved of—and will continue to disapprove of—the Conduct at Issue. The Court found that, even after accepting these pro-Buyer premises as true, there was a serious conflict between the securities laws and antitrust laws because: (1) there was a fine line separating the activity that the SEC permits (for which Buyers must concede antitrust immunity) from the activity that the SEC forbids (which, under Buyers' argument, should be open to antitrust claims), and the securities experts are in the best position to determine on what side of the line Underwriters' conduct falls; (2) "the need for securities-related expertise"; (3) "the overlapping

evidence from which reasonable but contradictory inferences may be drawn"; and (4) the risk of inconsistent court results in factually similar circumstances. *Id.* at 2394–96. The Court stated that in the IPO context, "there [was] no practical way to confine antitrust suits so that they challenge only ... activity that is presently unlawful and will likely remain unlawful under the securities law[s]." *Id.* at 2395. Rather, the Court stated that "antitrust courts are likely to make unusually serious mistakes," and the threat of such mistakes may cause Underwriters to act in ways that will avoid "a wide range of joint conduct that the securities law[s] permit[ ] or encourage[ ] (but which [Underwriters] fear could lead to an antitrust lawsuit and the risk of treble damages)." *Id.* at 2395–96.

After determining that the Factors were satisfied, the Court concluded that, within the IPO context at issue, the securities laws were clearly incompatible with the application of the antitrust laws.

### 2. *Application of Billing to the Amended Complaint*

■ The Court finds that, within the short sale context at issue, the antitrust laws are clearly incompatible with the securities laws.

### a. *An Area of Conduct Squarely Within the Heartland of Securities Regulations*

The short sale securities market lies squarely within an area of financial market activity that the securities laws seek to regulate, Short selling provides the securities markets with market liquidity and pricing efficiency. *See* 68 Fed.Reg. 62,972, 62,974 (Nov. 6, 2003). Short selling provides market liquidity because it may offset temporary imbalances in the buying

and selling interest for securities, which may reduce the risk that the price paid on the open market is artificially high due to temporary contractions of selling interest. *See id.* Short Sellers increase stock pricing efficiency because their transactions inform the market of the short sellers' evaluations of future stock price performance (*i.e.*, by engaging in short sales, Short Sellers inform the market that they believe particular securities are overvalued), and this evaluation is reflected in the particular securities' resulting market price. *See id.* at n. 21. The Court finds that the liquidity and pricing benefits created by the short sales place these transactions "within the heartland" of federal securities regulation and are "central to the proper functioning of well-regulated capital markets." *Billing,* 127 S.Ct. at 2392.

b. *Clear and Adequate SEC Authority to Regulate*

Under the securities laws, the SEC has regulatory authority to supervise short sale transactions. It is unlawful "[t]o effect a short sale ... of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Securities Exchange Act of 1934 § 10(a), 15 U.S.C. § 78j(a)(1) ("Section 10(a)"). Section 10(a) grants the SEC "plenary authority to regulate short sales of securities registered on a national securities exchange ... as necessary to protect investors." 68 Fed.Reg. 62,972, 62,973 (Nov. 6, 2003).

The SEC may permit a national securities exchange to impose a schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by broker-dealers for effecting transactions, provided that the fees set are reasonable and do not impose any burden on competition not necessary or appropriate to further the purposes of the securities laws. *See* 15 U.S.C. § 78f(e)(1)(B). Congress has authorized the SEC to oversee the national securities clearance and settlement system. *See id.* at § 78q(d)(1). Thus, similar to the context in *Billing,* "the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect" of the short sale securities market. *Billing,* 127 S.Ct. at 2392.

c. *Active and Ongoing Agency Regulation*

The Court notes that the regulatory agencies have exercised their authority to supervise short sale transactions. The SEC adopted Regulation SHO to regulate aspects of short sale transactions, such as determining prerequisites for effecting short sale transactions and defining broker-dealers' delivery obligations. *See* 17 C.F.R. § 242.203(b) (2007); *see also* Division of Market Regulation: Key Points About Regulation SHO (April 11, 2005), *available at* http://www.sec.gov/spotlight/keyregshoissues.htm (last visited Dec. 19, 2007) (stating that "Regulation SHO was adopted to update short sale regulation in light of numerous market developments since short sale regulation was first adopted in 1938"). The SEC has monitored Regulation SHO's effects, amending it where appropriate. *See* SEC Release No. 34–55970 (removing price tests and restrictions on short sale execution prices to provide a more consistent regulatory environment). The National Association of Securities Dealers ("NASD") and New York Stock Exchange have also actively enforced their short sale regulations. *See, e.g., In re Dep't of Mkt. Regulation v. Ko Secs., Inc.,* No. CMS000142, 2004 WL 2983057, at *8–10 (N.A.S.D.R. Dec. 20, 2004) (affirming sanctions imposed for vio-

lations of NASD short sale rules because the member did not make an affirmative determination that it would receive delivery of the shorted securities by the settlement date); *In re Helfant Group, Inc.,* Exchange Hearing Panel Decision 04–3 (Jan. 13, 2004) (finding that a member violated Exchange Rule 440C, which requires members to maintain written evidence of affirmative determinations of stock availability prior to effecting short sale transactions).

By regulating short sale transactions, the SEC and other securities regulators have "exercised [their] legal authority to regulate conduct of the general kind at issue." *Billing,* 127 S.Ct. at 2393.

### d. *Serious Conflict Between the Antitrust and Securities Laws*

The securities laws are in serious conflict with the antitrust laws within the short sale context at issue. After *Billing,* the serious conflict question now before this Court is, assuming that the SEC disapproves of (and will continue to disapprove of) the conduct at issue, whether "allow[ing] an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities market." *Id.* at 2394–96.

ETG's claim that Defendants conspired to classify particular securities as hard-to-borrow and to fix minimum borrowing rates, in this Court's application of *Billing's* Fourth Factor, poses a serious legal line-drawing problem. A fine and complex line exists separating conduct that the SEC permits or encourages, which would foreclose antitrust liability, from activity that the SEC must forbid, which would allow for antitrust liability. ETG argues that daily communications regarding short sale transactions among Defendants crossed the line from communications permitted by the SEC to those outlawed by

the antitrust laws. In order for one of the Defendants to effectuate a trade on a Short Seller's behalf, that defendant generally contacts another brokerage firm (likely another one of the Defendants) to locate and borrow the securities. The Defendants' transactions necessarily involve the exchange of information regarding the availability and price of securities, and such exchanges are implicitly permitted by the SEC's Regulation SHO. *See* 17 C.F.R. § 242.203(b)(1) (2007) (requiring that, prior to accepting a short sale order, the broker-dealer borrow the security, enter into an arrangement to borrow the security, or have reasonable grounds to believe that the security can be borrowed).

There is clear overlap in the short sale context between "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities [conduct]." *Billing,* 127 S.Ct. at 2395. Allowing ETG's antitrust suit to continue would deter Defendants from engaging in conduct lawful under the SEC's regulatory scheme, because, in support of its conspiracy claim at a trial, ETG would likely seek to introduce evidence of Defendants' daily, permissible conversations regarding particular securities' trading information. The threat of a "nonexpert jury" mistaking lawful conduct under the securities laws as evidence of a conspiracy under the antitrust laws and exacerbated by the prospect of trebled damages, would place immense pressure on Defendants to curtail the open exchange of information. Such antitrust suits would likely chill a broad range of activities that the securities laws permit and encourage, and would likely inhibit the short selling activity that provides market liquidity and pricing efficiency.

ETG's claim that Defendants' alleged conspiracy included Seller's Broker tolerating FTDs without forcing Purchaser's Broker to actually deliver the securities, is

also in serious conflict with the securities laws. Under Regulation SHO, only an FTD involving a "threshold security"[1] violates the securities laws. *See generally* 17 C.F.R. § 242.203 (2007). In the Amended Complaint, ETG defined the Class Securities as any security that Defendants classified and presented to ETG and Class Members as "hard-to-borrow," and accordingly, the Class Securities may include non-threshold securities. The SEC has elected not to require broker dealers that fail to receive a non-threshold security to "buy-in" the other party to the transaction. *See* Division of Market Regulation: Responses to Frequently Asked Questions Regarding Regulation SHO, Question 7.3 (July 6, 2007), *available at* http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm (last visited Dec. 19, 2007) (stating that the SEC has declined to allow the National Clearing Corporation to require that brokers force buy-ins because forcing buy-ins may increase the risk in clearing and settling transactions and may interfere with the pricing of securities). Allowing ETG to use the antitrust laws to attack Defendants' alleged decisions not to force buy-ins would impose *de facto* delivery requirements in spite of the SEC's reluctance to impose such blanket requirements.

For the reasons stated above, the Court is persuaded that there is clear incompatibility between the securities laws and antitrust laws within the short sale context before the Court. Accordingly, the Court grants Defendants' Rule 12(b)(6) motion to dismiss the Antitrust Claim. Because the Court grants Defendants' Rule 12(b) (6) motion, there is no need for the Court to address Defendants' motion to dismiss pursuant to Rule 9(b).

## C. *ETG's State Law Claims*

ETG also alleges state law claims for common law breach of fiduciary duty (against Fiduciary Defendants only), common law aiding and abetting breach of fiduciary duty, and common law unjust enrichment (collectively, the "State Law Claims"). ETG submits that this Court has supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(a) ("Section 1367(a)").

 Federal courts "may examine subject matter jurisdiction, *sua sponte*, at any stage of the proceeding." *Adams v. Suozzi*, 433 F.3d 220, 224 (2d Cir.2005) (citation and quotation marks omitted). Federal district courts have supplemental jurisdiction over state-law claims that are "so related" to the claims over which the court has original jurisdiction that they form part of the same "case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A District court may "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3). After a court's discretion to exercise supplemental jurisdiction is triggered under § 1367(c)(3), the court is to "balance[ ] the traditional Values of judicial economy, convenience, fairness, and comity' in deciding whether to extend jurisdiction." *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (*quoting Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining

---

1. Under Regulation SHO, the term "threshold security" means "any equity security of an issuer that is registered pursuant to [15 U.S.C. § 78l] or for which the issuer is required to file reports pursuant to [15 U.S.C. § 78o(d) ]." 17 C.F.R. § 242.203(c) (6) (2007).

state-law claims." *Cohill,* 484 U.S. at 350 n. 7, 108 S.Ct. 614 ; *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal law claims are dismissed before trial ... the state claims should be dismissed as well.").

■ The Court has original jurisdiction over ETC's federal Antitrust Claim pursuant to 28 U.S.C. §§ 1331 and 1337. ETG's State Law Claims rely on supplemental jurisdiction pursuant to Section 1367(a). Because the Court has granted Defendants' motion to dismiss ETG's Antitrust Claim, there is no longer a claim over which the Court has original jurisdiction. ETG's federal-law claim was "eliminated on a motion to dismiss, prior to the investment of significant judicial resources." *Kolari,* 455 F.3d at 123. By permitting the claims to be re-filed in state court, ETG's State Law Claims "will be afforded a 'surer-footed reading of applicable law.' " *Id.* at 123–24 (*quoting Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130). After considering the values of judicial economy, convenience, fairness, and comity, the Court grants Defendants' motion to dismiss the State Law Claims without prejudice.

### III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 74) of defendants Morgan Stanley & Co., Inc.; Morgan Stanley DW Inc. ("MSDW"); Bear Stearns Companies, Inc. ("Bear Stearns"); The Goldman Sachs Group, Inc.; Goldman Sachs & Co. ("GSC"); Goldman Sachs Execution & Clearing, L.P. ("GSEC"); UBS Financial Services, Inc. ("UBS"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); Citigroup Inc.; Citigroup Global Markets, Inc. ("CGM"); Credit Suisse (USA) Inc.; Credit Suisse Securities (USA) L.L.C. ("CSS"); Deutsche Bank Se-

curities, Inc. ("Deutsche Bank"); Lehman Brothers, Inc. ("Lehman"); Banc of America Securities L.L.C. ("Banc of America"); Van der Moolen Specialists USA, L.L.C. ("Van der Moolen"); and CIBC World Markets Corp. ("CIBC") (collectively, "Defendants") to dismiss the claim of plaintiff Electronic Trading Group L.L.C.'s ("ETG") pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, is GRANTED with prejudice; and it is further

**ORDERED** that the claims of ETG for aiding and abetting breach of fiduciary duty and unjust enrichment are dismissed as against Defendants without prejudice; and it is finally

**ORDERED** that the claim of ETG for breach of fiduciary duty as against MSDW, Bear Stearns, GSEC, GSC, UBS, Merrill Lynch, CGM, CSS, Deutsche Bank, Lehman, Banc of America, Van der Moolen, and CIBC is dismissed without prejudice.

The Clerk of Court is directed to close this case.

**SO ORDERED.**