08-0420-cv
In re Short Sale Antitrust Litig.

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: September 30, 2009    Decided: December 3, 2009)

Docket No. 08-0420-cv

- - - - - - - - - - - - - - - - - - - - -x

ELECTRONIC TRADING GROUP, LLC, on behalf of itself and all others similarly situated,

<u>Plaintiff-Appellant</u>,

- v.-

BANC OF AMERICA SECURITIES LLC, BEAR STEARNS COMPANIES, INC., CITIGROUP INC., CREDIT SUISSE (USA) INC., DEUTSCHE BANK SECURITIES, INC., GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. INCORPORATED, UBS FINANCIAL SERVICES, INC., CIBC WORLD MARKETS CORP., CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN SACHS EXECUTION & CLEARING, L.P., MORGAN STANLEY DW INC., THE GOLDMAN SACHS GROUP, INC., and VAN DER MOOLEN SPECIALISTS USA, LLC,

<u>Defendants-Appellees</u>,

JOHN DOES, DAIWA AMERICA CORPORATION, DAIWA SECURITIES AMERICA INC., BANK OF NEW YORK, J.P. MORGAN CHASE & CO., J.P. MORGAN SECURITIES INC., and LEHMAN BROTHERS INC.,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

Before: JACOBS, Chief Judge, SACK and LYNCH, Circuit Judges.

Plaintiff-appellant Electronic Trading Group, LLC appeals from a judgment of the United States District Court for the Southern District of New York (Marrero, J.) dismissing a Sherman Act claim with prejudice and dismissing three state law claims without prejudice to refiling in state court. The district court evaluated the four considerations recently articulated by the United States Supreme Court in Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264 (2007), and found implied preclusion from antitrust liability. We affirm.

ANDREW J. ENTWISTLE, VINCENT R. CAPPUCCI, HAROLD F. McGUIRE, JR., ARTHUR V. NEALON, and STEPHEN D. OESTREICH, Entwistle & Cappucci LLP, New York, New York, for Appellant Electronic Trading Group, LLC.

ROBERT F. WISE, JR., and WILLIAM J. FENRICH, Davis Polk & Wardwell LLP, New York, New York, for Appellees Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.

2

RICHARD H. KLAPPER and RICHARD C. PEPPERMAN, II, Sullivan & Cromwell LLP, New York, New York, for Appellees Goldman, Sachs & Co., Goldman Sachs Execution & Clearing, L.P., and The Goldman Sachs Group, Inc.

STEPHEN L. RATNER and HARRY FRISCHER, Proskauer Rose LLP, New York, New York, for Appellee Bear Stearns Companies, Inc.

JAY B. KASNER and SHEPARD GOLDFEIN, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Appellee Merrill Lynch, Pierce, Fenner & Smith Incorporated.

JAY P. LEFKOWITZ, MARIA GINZBURG, ANDREW B. CLUBOK, SUSAN E. ENGEL, and ELEANOR R. BARRETT, Kirkland & Ellis LLP, New York, New York and Washington, D.C., for Appellee UBS Financial Services, Inc.

ROBERT B. McCAW, FRASER L. HUNTER, JR., and ALI M. STOEPPELWERTH, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York and Washington, D.C., for Appellees Citigroup Inc., Citigroup Global Markets, Inc., Credit Suisse (USA) Inc., and Credit Suisse Securities (USA) LLC.

ANDREW J. FRACKMAN and BRENDAN J. DOWD, O'Melveny & Myers LLP, New York, New York, for Appellee Banc of America Securities LLC.

3

GREGORY A. MARKEL and MARTIN L. SEIDEL, Cadwalader, Wickersham & Taft LLP, New York, New York, for Appellee Deutsche Bank Securities, Inc.

DANIEL B. RAPPORT, KATHERINE L. PRINGLE, and LISA S. GETSON, Friedman Kaplan Seiler & Adelman LLP, New York, New York, for Appellee Van Der Moolen Specialists USA, LLC.

JONATHAN D. POLKES, ROBERT F. CARANGELO, and DEBRA J. PEARLSTEIN, Weil, Gotshal & Manges LLP, New York, New York, for Appellee CIBC World Markets Corp.

DENNIS JACOBS, Chief Judge:

In this putative class action, plaintiff-appellant Electronic Trading Group, LLC ("ETG"), a short seller, sues certain financial institutions that serve as "prime brokers" in short sale transactions.[1] It is alleged that the prime brokers arbitrarily designated certain securities as hard-

---

[1] The defendants-appellees are Banc of America Securities LLC; Bear Stearns Companies, Inc.; Citigroup Inc.; Credit Suisse (USA) Inc.; Deutsche Bank Securities, Inc.; Goldman, Sachs & Co.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co., Incorporated; UBS Financial Services, Inc.; CIBC World Markets Corp.; Citigroup Global Markets, Inc.; Credit Suisse Securities (USA) LLC; Goldman Sachs Execution & Clearing, L.P.; The Goldman Sachs Group, Inc.; Van Der Moolen Specialists USA, LLC; and Morgan Stanley DW Inc.

4

to-borrow and then fixed the price for borrowing them, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "antitrust claim").[2] Three state law claims are also pleaded: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment (collectively, the "state law claims").[3]

ETG appeals from a judgment of the United States District Court for the Southern District of New York (Marrero, J.), dismissing the antitrust claim with prejudice on the ground of implied preclusion of the antitrust law by the securities law, and dismissing the state law claims

---

[2] "A complaint pleading a violation of section 1 must allege a contract, combination or conspiracy that unreasonably restrains trade." Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 243 (2d Cir. 1997).

[3] ETG brought the breach of fiduciary duty claim against Morgan Stanley DW Inc.; Bear Stearns Companies, Inc.; Goldman Sachs Execution & Clearing, L.P.; Goldman, Sachs & Co.; UBS Financial Services, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Citigroup Global Markets, Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities, Inc.; Banc of America Securities LLC; Van Der Moolen Specialists USA, LLC; and CIBC World Markets Corp.
ETG brought the aiding and abetting breach of fiduciary duty claim against the parent corporations of some of the prime brokers named in the breach of fiduciary duty claim-- Morgan Stanley & Co., Incorporated; The Goldman Sachs Group, Inc.; Citigroup Inc.; and Credit Suisse (USA) Inc.

without prejudice to refiling in state court.  We affirm.

The preclusion analysis turns on four considerations identified in Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264, 285 (2007): whether the "area of conduct [is] squarely within the heartland of securities regulations"; whether the Securities and Exchange Commission ("SEC") has "clear and adequate [] authority to regulate"; whether there is "active and ongoing agency regulation"; and whether "a serious conflict" arises between antitrust law and securities regulations.

Much depends on the level of particularity or generality at which each Billing consideration is evaluated. Obviously, if the inquiry is whether the SEC actively regulates the pricing of borrowed shares, the plaintiff wins the point.  By the same token, if the inquiry is whether short selling is within the heartland of securities regulations, the defendants win the point.

For the reasons set forth in this opinion, the fourth consideration--detection of a serious conflict--is evaluated at the level of the alleged anticompetitive conduct.  Each of the three remaining considerations is evaluated at the level most useful to the court in achieving the overarching

6

goal of avoiding conflict between the securities and antitrust regimes.

**BACKGROUND**

**A.    Short Selling**

A short sale transaction proceeds in the following sequence.  The short seller identifies securities she believes will drop in market price, borrows these securities from a broker (prime brokers have the greatest market share), sells the borrowed securities on the open market, purchases replacement securities on the open market, and returns them to the broker--thereby closing the short seller's position.  The short seller's profit (if any) is the difference between the market price at which she sold the borrowed securities and the market price at which she purchased the replacement securities, less borrowing fees, brokerage fees, interest, and any other charges levied by the broker.

**B.    The Role of the Prime Brokers**

In the context of short selling, a prime broker locates the short seller's requested securities, lends those

7

securities to the short seller for a fee, and delivers those securities to the short seller's purchaser.

A short seller seeking to borrow securities contacts the broker's securities loan desk. Pursuant to SEC regulations, the securities loan desk must locate the requested securities before it can accept the short seller's order. See 17 C.F.R. § 242.203(b)(1)(i)-(iii). The securities loan desk may locate the securities in its own proprietary accounts, or in the hands of other brokers or institutional investors with significant long positions. Alternatively, the securities loan desk may locate the securities through a third party who assists the broker in exchange for a locate fee.

The broker charges the short seller a borrowing fee affected by supply and demand: the harder the security is to find and borrow, the higher the fee. The broker may develop an easy-to-borrow list of securities that are in abundant supply and a hard-to-borrow list of securities that are scarce. See Short Sales, Exchange Act Release No. 34-50103, 83 SEC Docket 1278 (July 28, 2004).

A short seller who has sold the borrowed securities on the open market must deliver those securities to the

8

purchaser within three days of the transaction date.  If the short seller's broker does not deliver in time, a failure-to-deliver ("FTD") occurs.

**C.   The Borrowing Fees Conspiracy**

It is alleged that from April 12, 2000 to the present, the prime brokers charged "artificially inflated" borrowing fees by agreeing on which securities to designate arbitrarily as hard-to-borrow, and setting minimum borrowing fees for these securities.  (There are other allegations, set out in the margin, which we do not reach.[4])

---

[4] ETG's Amended Class Action Complaint (the "complaint") also alleges that the prime brokers (i) failed to enforce the delivery of securities, thereby enabling the prime brokers to charge borrowing fees for securities that were never actually borrowed and giving rise to intentional FTDs; and (ii) charged improper locate fees when the securities were never found and/or borrowed.  On appeal, ETG argues that the complaint's "references to failures to deliver" and "improper and unjustified locate fees" were "pleaded [only] as an adjunct to [ETG's] price-fixing claim."  Appellant's Reply Br. 17 & 17 n.12.  The prime brokers argue that ETG improperly seeks to amend the complaint on appeal by recharacterizing these allegations from integral components of the conspiracy to ancillary means of expanding the conspiracy's scope.  Appellees' Opp'n Br. 24-25.  We do not reach this issue, because dismissal remains appropriate even if we adopt ETG's appellate posture.

**D.   Procedural History**

On March 15, 2007, the prime brokers moved to dismiss the antitrust claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  On June 18, 2007, the United States Supreme Court decided <u>Billing</u>.  On December 20, 2007, the district court applied <u>Billing</u>, granted the prime brokers' motion to dismiss the antitrust claim under Rule 12(b)(6), and declined to exercise supplemental jurisdiction over the state law claims.[5]  ETG timely appealed the district court's decision, arguing principally that the district court misapplied <u>Billing</u>.

## DISCUSSION

"We review the district court's grant of a Rule 12(b)(6) motion <u>de novo</u>, drawing all reasonable inferences in plaintiff['s] favor, and accepting as true all the factual allegations in the complaint."  <u>In re Elevator Antitrust Litig.</u>, 502 F.3d 47, 50 (2d Cir. 2007) (<u>per curiam</u>) (internal quotation marks, citations, and brackets

---

[5] The district court did not reach the alternative Rule 9(b) ground for dismissal of the antitrust claim.  We do not reach this ground because we affirm the district court's Rule 12(b)(6) dismissal.

10

omitted).

Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264 (2007), was an antitrust action against underwriting firms that marketed and distributed shares in initial public offerings ("IPO"). The plaintiffs alleged "that the underwriters unlawfully agreed with one another that they would not sell shares of a popular new issue to a buyer unless that buyer committed (1) to buy additional shares of that security later at escalating prices (a practice called 'laddering'), (2) to pay unusually high commissions on subsequent security purchases from the underwriters, or (3) to purchase from the underwriters other less desirable securities (a practice called 'tying')." Id. at 267.

The Supreme Court ruled that federal securities law implicitly precluded application of the antitrust law to the underwriters' alleged anticompetitive conduct. The Court articulated four considerations that bear upon whether "the securities laws are 'clearly incompatible' with the application of the antitrust laws" in a particular context: (A) location within the heartland of securities regulations; (B) SEC authority to regulate; (C) ongoing SEC regulation; and (D) conflict between the two regimes. Id. at 285. In

11

selecting the level of particularity at which to address each consideration, we draw guidance from the specifics of the Supreme Court's analysis in Billing, without suggesting, however, that the level of particularity applied to each consideration in this case is prescriptive in every context.

**A.    Heartland**

To ascertain whether "the possible conflict" between securities law and antitrust law affects "practices that lie squarely within an area of financial market activity that the securities law seeks to regulate," the Supreme Court looked to the broad underlying market activity.  Billing, 551 U.S. at 276.  In deciding that the antitrust allegations "concern practices that lie at the very heart of the securities marketing enterprise," the Court considered "the activities in question," which were found to consist of "the underwriters' efforts jointly to promote and to sell newly issued securities."  Id.  Accordingly, the Court focused on whether "[t]he IPO process" (the underlying market activity in Billing) was within the heartland (and ruled that it was); it did not focus on the laddering and tying arrangements (the alleged anticompetitive conduct in

12

Billing).  Id.  This analysis suggests that the first consideration is properly evaluated at the level of the underlying market activity.

Accordingly, in this case, we consider whether short selling is within the heartland of the securities business. The district court found that "the liquidity and pricing benefits created by the short sales place these transactions 'within the heartland' of federal securities regulation and are 'central to the proper functioning of well-regulated capital markets.'"  In re Short Sale Antitrust Litig., 527 F. Supp. 2d 253, 259 (S.D.N.Y. 2007) (quoting Billing, 551 U.S. at 276).  ETG itself recognizes that "short selling is market activity regulated by the securities law." Appellant's Reply Br. 3.

Short selling--the underlying market activity in this case--is "an area of conduct squarely within the heartland of securities regulations."  Billing, 551 U.S. at 285.  The first consideration thus weighs in favor of implied preclusion.

**B.  Authority to Regulate**

To ascertain "the existence of regulatory authority

13

under the securities law to supervise the activities in question" in Billing, 551 U.S. at 275, the Supreme Court looked to the role of the underwriters in the IPO process as well as to the alleged laddering and tying arrangements, see id. at 276-77. The Court determined that "the law grants the SEC authority to supervise all of the activities here in question. Indeed, the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which underwriters engage." Id. at 276. The Court thus gauged regulation of activity that is more particular than the IPO process (the underlying market activity) and more general than the laddering and tying arrangements (the alleged anticompetitive conduct).

In addition, the Court cited regulations that grant the SEC power to regulate "communications between underwriting participants and their customers, including those that occur during road shows," which suggests that the Court also gauged regulation of the specific alleged anticompetitive conduct. Id. at 277.

Accordingly, we consider the existence of SEC authority to regulate (i) the role of the prime brokers in short

selling, and (ii) the borrowing fees charged by prime brokers. We find such authority in Section 10(a), Section 6, and 15 U.S.C. §§ 78o(c)(2)(D) and 78j(b).

Section 10(a) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o effect a short sale . . . of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(a)(1). Citing legislative history, ETG argues that Section 10(a) was intended only to regulate the manipulation of share price through short selling. See Appellant's Br. 20-21. However, nothing in the wording of Section 10(a) so limits its reach; and the SEC has interpreted Section 10(a) as a grant of "plenary authority to regulate short sales of securities registered on a national securities exchange . . . ." Short Sales, Exchange Act Release No. 34-48709, 68 Fed. Reg. 62,972 (proposed Nov. 6, 2003). The SEC thus has the authority to regulate the role of the prime brokers in short selling, as well as the borrowing fees charged by the prime brokers, pursuant to Section 10(a).

15

Section 6 of the Securities Exchange Act of 1934 provides that the SEC may "permit a national securities exchange, by rule, to impose a schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members for effecting transactions" if such fees are "reasonable" and "do not impose any burden on competition not necessary or appropriate" to further the purposes of the securities law. 15 U.S.C. § 78f(e)(1)(B). ETG characterizes Section 6 as a grant of limited authority to permit exchanges to deviate from "the general prohibition on fixed commission rates." Appellant's Br. 22. Even accepting this characterization, the SEC thus has indirect authority to regulate the rates (including the borrowing fees) charged by the prime brokers in short selling.

In Billing, the Supreme Court relied in part on 15 U.S.C. §§ 78o(c)(2)(D) and 78j(b) as evidence of the SEC's broad power to define and prevent fraudulent, deceptive, and manipulative conduct by brokers and dealers. 551 U.S. at 277. These provisions apply with equal force to the role of the prime brokers in short selling and the borrowing fees they charge.

This second Billing consideration--focused as it is on

16

whether the SEC has authority to regulate the role of the prime brokers in short selling and the borrowing fees charged by the prime brokers--thus weighs in favor of implied preclusion, even though none of the provisions discussed above explicitly references the regulation of borrowing fees.

**C.   Ongoing Regulation**

To evaluate "evidence that the responsible regulatory entities exercise [their] authority," Billing, 551 U.S. at 275, the Supreme Court looked to the role of the underwriters in the IPO process, see id. at 277.  The Court determined that "the SEC has continuously exercised its legal authority to regulate conduct of the general kind now at issue.  It has defined in detail, for example, what underwriters may and may not do and say during their road shows."  Id.  The Court thus looked to activity more particular than the IPO process (the underlying market activity) and more general than the laddering and tying arrangements (the alleged anticompetitive conduct).

In this case, we therefore consider whether there is ongoing SEC regulation of the role of the prime brokers.

17

Ample evidence reveals that the SEC exercises its authority to regulate the role of the prime brokers in short selling. "[A]ctive and ongoing agency regulation" is evidenced by Regulation SHO and a recent SEC roundtable. Id. at 285.

Regulation SHO, adopted by the SEC in 2004, imposes a "locate" requirement on brokers involved in short selling. See 17 C.F.R. § 242.203(b)(1)(i)-(iii) ("A broker or dealer may not accept a short sale order in an equity security from another person . . . unless the broker or dealer has: (i) [b]orrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) [r]easonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due. . . ."). Regulation SHO also imposes a "delivery" requirement on such brokers. See 17 C.F.R. § 242.203(b)(3) (with certain enumerated exceptions, "[i]f a participant of a registered clearing agency has a fail to deliver position at a registered clearing agency in a threshold security for thirteen consecutive settlement days, the participant shall immediately thereafter close out the fail to deliver position by purchasing securities of like kind and quantity"). Regulation SHO thus constitutes an exercise of

18

the SEC's authority to supervise the role of the prime brokers in short selling.

On September 29-30, 2009 (at the time of oral argument in this appeal), the SEC hosted a roundtable "regarding securities lending and short sales." Securities Lending and Short Sale Roundtable, Exchange Act Release No. 34-60643, 2009 WL 2915632, at *1 (Sept. 10, 2009) (announcing the roundtable). The roundtable intended to focus on "a range of securities lending topics, such as current lending practices and participants, compensation arrangements and conflicts, the benefits and risks of securities lending, risks related to cash collateral reinvestment, improvements to transparency, and consideration of whether the securities lending regulatory regime can be improved for the benefit of investors." Id. The roundtable also intended to focus on "short sale disclosure topics" and addressed "the potential impact of imposing a pre-borrow or enhanced 'locate' requirement on short sellers . . . as a way to curtail abusive 'naked' short selling." Id. This roundtable indicates active SEC monitoring of the role of the prime brokers in short selling.

ETG's complaint implicitly confirms active regulation.

19

The complaint affirmatively alleges, presumably to flesh out claims of wrongdoing, that certain prime brokers "have been fined for not borrowing securities or failing to enter into agreements to borrow securities that are sold in short sale transactions and/or having reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the delivery due date," Compl. ¶ 91, and that "federal prosecutors and the [New York Stock Exchange] have launched a joint investigation into [certain prime brokers'] alleged price gouging . . . by artificially inflating borrowing fees and by charging fees for which no services were rendered," id. ¶ 92. A fair inference from these allegations is that the SEC and securities self-regulating organizations actively exercise regulatory authority over the role of the prime brokers in short selling.

Regulation SHO and the recent roundtable do not focus on the regulation of borrowing fees (the particular conduct alleged to be anticompetitive); but it is enough for this purpose that the SEC's ongoing regulation is focused on the role of the prime brokers in short selling. The third consideration thus weighs in favor of implied preclusion.

**D.    Conflict**

To ascertain the "risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct," Billing, 551 U.S. at 275-76, the Supreme Court considered whether allowing antitrust liability for the conduct alleged to have the anticompetitive effect would inhibit permissible (and even beneficial) market behavior. See id. at 282 ("And the threat of antitrust mistakes, i.e., results that stray outside the narrow bounds that plaintiffs seek to set, means that underwriters must act in ways that will avoid not simply conduct that the securities law forbids (and will likely continue to forbid), but also a wide range of joint conduct that the securities law permits or encourages (but which they fear could lead to an antitrust lawsuit and the risk of treble damages)."). In evaluating conflict, therefore, the proper focus is on the alleged anticompetitive conduct:

> [W]e do not read the complaints as attacking the
> bare existence of IPO underwriting syndicates or
> any of the joint activity that the SEC considers a
> necessary component of the IPO-related syndicate
> activity. . . . Nor do we understand the complaints
> as questioning underwriter agreements to fix the

>levels of their commissions, whether or not the resulting price is "excessive." We . . . read the complaints as attacking the *manner* in which the underwriters jointly seek to collect "excessive" commissions. The complaints attack underwriter efforts to collect commissions through certain practices (i.e., laddering, tying, collecting excessive commissions in the form of later sales of the issued shares) . . . .

Id. at 278 (citations omitted).

In this case, therefore, we consider the impact that antitrust liability may have on arrangements for borrowing fees. ETG argues (i) that "there should be little difficulty in distinguishing collusive fee-fixing agreements from routine communications concerning stock availability and market pricing permissible under Regulation SHO"; and (ii) that "there is no actual or potential conflict that necessitates immunity" because neither the securities law nor the antitrust law permit the collusive fixing of borrowing fees. Appellant's Br. 32-33. The district court found otherwise. See In re Short Sale Antitrust Litig., 527 F. Supp. 2d at 260.

We conclude that antitrust liability would create actual and potential conflicts with the securities regime. An actual conflict arises because antitrust liability would inhibit the prime brokers (and other brokers) from engaging

22

in other conduct that the SEC currently permits and that benefits the efficient functioning of the short selling market.  There is a potential conflict because the SEC in the future may decide to regulate the borrowing fees charged by brokers.

### 1.  Actual Conflict

Antitrust liability would inhibit conduct that the SEC permits and that assists the efficient functioning of the short selling market.  The thrust of ETG's case is that the prime brokers communicated with one another to designate hard-to-borrow securities and to fix inflated borrowing fees for those securities.  However, it is permissible for brokers to communicate about the availability and price of securities.  As the district court observed, "such exchanges are implicitly permitted by the SEC's Regulation SHO."  In re Short Sale Antitrust Litig., 527 F. Supp. 2d at 260 (citing 17 C.F.R. § 242.203(b)(1) (requiring that a broker borrow the securities or have reasonable grounds to believe that the securities can be borrowed before accepting an order from a short seller)).  It is a lot to expect a broker "to distinguish what is forbidden from what is allowed," so that the broker collects just so much information as

required to satisfy the locate requirement and for the efficient functioning of the short selling market--but not an iota more--or suffer treble damages. Billing, 551 U.S. at 280.

Conflict is a risk unless there is a "practical way to confine antitrust suits so that they challenge only activity of the kind the [plaintiffs] seek to target" without inhibiting other conduct that is permitted or encouraged under the securities law. Id. at 282. The drawing of such intricate lines demands "securities-related expertise." Id. Moreover, it is likely that the very communications in which short sellers do what the securities law allows would by "reasonable but contradictory inferences" serve as evidence of conduct forbidden by the antitrust law. Id. Reliance on a jury therefore gives rise to a serious "risk of inconsistent court results." Id.

Antitrust liability, with the prospect of treble damages, would be an incentive for the prime brokers to curb their permissible exchange of information and thereby harm the efficient functioning of the short selling market. This inhibiting effect weighs in favor of implied preclusion.

**2. Potential Conflict**

24

In addition to the actual conflict described above, a potential conflict exists based on the possibility that the SEC will act upon its authority to regulate the borrowing fees set by prime brokers.  As the Supreme Court acknowledged in Billing, a potential conflict of this kind may exist even if there is no conflict that is actual and immediate.  See Billing, 551 U.S. at 273 (describing the "upshot" of Gordon v. N.Y. Stock Exch., Inc., 422 U.S. 659, 690-91 (1975), as "in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect to a practice that both antitrust law and securities law might forbid").  In the context of an implied repeal case, this Court observed that "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit."  In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d 134, 149 (2d Cir. 2003).

It is therefore not decisive that neither securities law nor antitrust law allows--or encourages--the collusive fixing of borrowing fees.  The present securities regime expressly allows prime brokers to rely on easy-to-borrow

25

lists as reasonable grounds "to believe that the security sold short is available for borrowing without directly contacting the source of the borrowed securities."  Short Sales, Exchange Act Release No. 34-50103, 83 SEC Docket 1278 (July 28, 2004).  The SEC has taken note that hard-to-borrow lists "are not widely used by broker-dealers" and that, therefore, "the fact that a security is not on a hard to borrow list cannot satisfy the 'reasonable grounds' test" described above.  Id.  But if and when such hard-to-borrow lists come into broader use, it is easy to see how they could increase the efficiency of the short selling market, in which event the SEC could move quickly to regulate the borrowing fees charged by brokers for securities appearing on such lists.  This potential conflict weighs in favor of implied preclusion.

**CONCLUSION**

All four Billing considerations weigh in favor of implied preclusion.[6]  We therefore affirm the district

---

[6] Because all four of the Billing considerations point in the direction of implied preclusion, we need not address the weight to be accorded these considerations when they point in different directions.

26

court's Rule 12(b)(6) dismissal of ETG's antitrust claim with prejudice. Moreover, we affirm the dismissal of ETG's state law claims without prejudice because we find no abuse of discretion in the district court's decision to decline to exercise supplemental jurisdiction over these claims. See Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006).